# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

United States of America,

                  Plaintiff,        Case No. 24-cr-20521

v.                              Judith E. Levy
                              United States District Judge

Deangello Hill,

                              Mag. Judge David R. Grand

                  Defendant.

_____/

## OPINION AND ORDER DENYING
## DEFENDANT'S MOTION TO SUPPRESS EVIDENCE [19]

On February 13, 2025, Defendant Deangello Hill filed a motion to suppress evidence under Federal Rules of Criminal Procedure 12(b)(3) and 41 and the Fourth Amendment. (ECF No. 19.) The government responded (ECF No. 21), and Defendant did not file a reply. On April 10, 2025, the Court held an evidentiary hearing. The government called one witness: Officer Naveed Bajpai from the Detroit Police Department (DPD). The Court heard oral argument as well.

A one-count indictment charges Defendant with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (ECF No.

11.) This charge is based on the recovery of a firearm during a warrantless search of Defendant's backpack by Bajpai on August 29, 2024.[1] (ECF No. 19, PageID.41–42, 45–46; ECF No. 21, PageID.51–53.) The question before the Court is whether the search of the backpack was unconstitutional such that the firearm must be suppressed.[2] The

_____

[1] The criminal complaint and the indictment state that Defendant's alleged violation of § 922(g)(1) occurred on August 29, 2024. (ECF No. 1, PageID.1; ECF No. 11, PageID.20.) Yet Bajpai testified that the events at issue in this case took place on August 30, 2024. Bajpai addressed the inconsistency as follows when asked about it during the hearing: "This arrest was initiated on the 29th. However, it was very close to midnight. So when the report number was pulled, it was probably in the early hours of the 30th."

[2] In his motion, Defendant asks that the Court suppress "all tangible evidence in this case as well as any statements allegedly made by [Defendant] to law enforcement officers." (ECF No. 19, PageID.41.) Defendant argues that the tangible evidence and statements "must be suppressed as the fruits of an illegal stop, detention, [and] arrest in violation of the Fourth Amendment and *Terry v. Ohio*, 392 U.S. 1, 21 (1968)." (ECF No. 19, PageID.43, 47.) Defendant argues that police officers "stopped, detained, and arrested" him without having reasonable suspicion and that the officers searched his backpack "without consent, a warrant, or any basis that would justify a warrantless search." (*Id.*)

The government argues in its response that the "search and seizure" of Defendant's backpack "was proper" because the backpack was abandoned. (ECF No. 21, PageID.56.) The government also argues that a statement made by Defendant— "[t]hat's not mine"—is admissible and "do[es] not violate *Miranda*." (*Id.* at PageID.57.) In addition, the government appears to argue that the statement is admissible because Bajpai "validly asked whether [Defendant] had a valid concealed pistol license" under Michigan law. (*Id.* at PageID.58; *see id.* at PageID.57–58 (discussing Michigan law).)

As noted, Defendant did not file a reply. So he did not address the government's arguments in a written submission. But during the hearing, defense counsel indicated that Defendant disagrees with the government's argument that

government argues that the search was proper because the backpack was abandoned. (ECF No. 21, PageID.56.) Defendant disagrees.

For the reasons set forth below, the Court finds that Defendant abandoned the backpack. Thus, the search of the backpack was not unconstitutional, and the firearm will not be suppressed. Defendant's motion is therefore denied.

## I.    Background

Bajpai testified that he has been employed by the DPD as a police officer for approximately six years. He is currently assigned to the 12th Precinct Special Operations Unit. He has been assigned to that unit for over four years. A special operations unit is primarily tasked with the investigation of violent crimes, particularly those involving firearms. The investigation generally takes place either by responding to 911 calls for service or by conducting street investigations. The street investigations are similar to patrol; the officers proactively patrol the

---

the backpack was abandoned. Defense counsel also indicated that the focus of Defendant's suppression motion is the firearm. Defense counsel stated that she believes the search was unlawful and wants "anything that came after the search to be suppressed." She stated that she "do[es]n't particularly care about the statement" and that she "do[es]n't think that there's a *Miranda* issue." As a result, in this Opinion and Order the Court analyzes the search of the backpack that led to the discovery of the firearm.

12th Precinct. In doing this type of patrolling, the officers are not responding to a specific 911 call.

Bajpai testified that on the evening of August 30, 2024, he was conducting a routine street investigation with two other officers. *See supra* note 1. (*See* Gov't Ex. 4 (Police Report).) He and the officers were in a semi-marked special operations vehicle (a Ford Explorer), and they were in the area of Eight Mile Road and Manor Street in the City of Detroit. (*See* Gov't Ex. 4 (Police Report).) Bajpai had previously been to this area. He described it as a residential block just south of Eight Mile Road, "which is a major thoroughfare in the area." Bajpai frequently conducts proactive patrol at Eight Mile Road and Manor Street. He testified that "[b]ased on [his] tenure and experience working Special Operations in the 12th Precinct, that specific block has been a hotspot for firearms and narcotic activity."

Bajpai was seated "in the rear of the vehicle behind the driver." He indicated that the vehicle had DPD markings on the side. But unlike "a traditional police vehicle with headlights on the top of the vehicle," the vehicle Bajpai was riding in had "red and blue lights . . . in the interior of the vehicle." Bajpai was wearing "a modified special

4

operations uniform," which "consists of green cargo pants, a black sweater or shirt, and then a black outer carrier [resembling a vest] that's clearly marked police on the front and on the back . . . in big bold white lettering."

Bajpai and the other two officers in the vehicle were traveling on Eight Mile Road, which runs east to west. From Eight Mile Road, they turned onto Manor Street, a two-way street that runs north to south. They headed south down Manor Street. (*See id.*; Gov't Ex. 1 (Map of Eight Mile Road and Manor Street).) Bajpai had a clear and unobstructed view of the area from the back seat on the driver's side of the police vehicle. It was dark outside, but light posts illuminated the area. The police vehicle's headlights were on.

Bajpai stated that as he and the officers "made a southbound turn on to Manor from Eight Mile, [Bajpai] observed a group of individuals, the majority of which were on the roadway on the eastside of the street." (*See* Gov't Ex. 4 (Police Report).) Bajpai saw approximately ten people. Bajpai indicated that some of the people "were congregated" and that he "also observed a group of three to four individuals who were standing on the roadway who appeared to actively be engaged in an

illegal game of dice." (*See id.*) Bajpai observed the group of dice players "almost immediately." Other individuals were in "smaller groups in close proximity" to the dice players.

Bajpai first observed Defendant on the east side of Manor Street.[3] Defendant was "congregating in th[e] group . . . engaged in the dice game." (*See id.*) Bajpai could not say if Defendant was "actively involved" in the game, "but he was observing them" and looking in the direction of the game. Defendant was standing "right essentially on the rear bumper directly behind" a silver Dodge Charger. Bajpai stated that when he "initially observed [Defendant], [Defendant] could probably reach out and touch the rear trunk area of that Charger." The Charger was parked on the east side of the street and facing north. The Charger was running.[4] Bajpai did not know who owned the Charger. The Charger was in close proximity to where other people were standing;

---

[3] Bajpai identified the third house south of Eight Mile Road, on the east side of Manor Street, as the residence closest to the point in the street where Bajpai initially saw Defendant. (*See* Gov't Ex. 1 (Map of Eight Mile Road and Manor Street).)

[4] Bajpai testified that he "didn't conclude much" at that time from the fact that the Charger was running. Based on his knowledge of the area, "almost all the cars are always left running. For what reason, [he] cannot say for certain. But it's not an uncommon occurrence. . . . While had there [sic] are people outside, they tend to keep their cars running."

6

the individuals playing the dice game "were standing right on the rear of the Dodge Charger on the roadway."

Bajpai saw that Defendant was wearing black pants, no shirt, and "a black durag style hat." (*See id.*) Defendant had a red and black miniature backpack or satchel "around his shoulders" that was "strapped around his body" and was sitting on his abdomen or upper chest area on the front of his body. (*See id.*) Bajpai referred to the item as a "cross body bag." Bajpai described that type of bag as being "about a 2 by 2 square that people tend to strap around their shoulders and it generally sits in their chest area."

Bajpai and the officers in the police car, who were heading south, slowly approached the northward-facing Charger from its front end until they were approximately parallel to it. Bajpai testified that "[a]s [his] partner drove the scout car closer, [Bajpai] observed [Defendant] look in the direction of [the] oncoming scout car and then duck behind the rear of [the] silver Dodge Charger that was parked on the roadway." (*See id.*) Bajpai estimated that at that point the "scout car was 15 to 25 feet away and approaching."

Bajpai, who was still in the police vehicle, indicated that he had a clear view of Defendant "[u]ntil he . . . bent down behind the silver Charger." Bajpai then "had no line of sight to [Defendant]." When Bajpai saw Defendant bend down, there were three to four individuals nearby. Those individuals "were all closely congregated by the rear end of that Charger still engaged in that dice game."

Bajpai stated that "[a]s [Defendant] came upright from his crouched position behind the silver Charger, [Bajpai] observed that [Defendant] was no longer in possession of that miniature backpack [Bajpai] had previously observed on [Defendant's] person." (*See id.*) Bajpai "couldn't observe [Defendant] take it off because [Bajpai's] view was obstructed by th[e] Charger . . . that he bent behind." And Bajpai "could not see the backpack [because] it was obstructed by th[e] silver Dodge Charger."[5] As a result, Bajpai could not have seen Defendant throw the backpack or dump out its contents.

According to Bajpai, after Defendant "came back up from ducking down," Defendant "c[a]me back into an upright position" and walked

_____

[5] The police report authored by Bajpai states, however, that when Defendant "stood back up in an upright position, [Bajpai] observed that he was no longer in possession of the mini backpack and observed it to be lying on the roadway near the rear passenger wheel of the Dodge Charger." (*See* Gov't Ex. 4 (Police Report).)

away from the backpack. (*See id.*) Bajpai did not recall Defendant having a nervous or fearful demeanor as he walked away; Bajpai believed Defendant had a flat affect. Defendant did not run away from the bag, and the officers did not have to chase him. Bajpai "observed [Defendant] . . . walk behind [the] scout car, which was now essentially parallel with the group of individuals that were playing dice." Bajpai then lost visibility of Defendant. (*See id.*) Bajpai's "assumption would be that [Defendant] walked from the eastside of the street to the west side of the street, which would probably be no more than 20 feet." But Bajpai "couldn't say where [Defendant] went as [Bajpai] lost line of sight when [Defendant] walked behind [the police] car from the eastside to the west side of the street."

Bajpai testified that he "believed [Defendant's] gesture [of ducking down] was in direct relation to police presence on that block." The reasons for this belief were that Bajpai observed Defendant "look quickly in the direction of [the] scout car, which essentially everyone knows what our police cars look like. The headlights are identifiable. There's a push bar. And we were in pretty close proximity, so it would have been tough to not notice that that was a police car." Based on his

training and experience, Bajpai believed at the time that Defendant "was trying to stash that backpack." Bajpai explained that he used the word "stash" in his testimony because when he eventually recovered the backpack, it was underneath the Charger. Bajpai stated that if Defendant—who had been standing behind the rear bumper of the Charger—had simply bent down and dropped the backpack at his feet, "it would have not been covered or obstructed by the rear wheel of that car[,] which is where [Bajpai subsequently] recovered it."

After Bajpai lost sight of Defendant, he informed the other officers in the police vehicle what he had observed and began to formulate a plan to recover the bag and possibly detain Defendant. (*See id.*) Bajpai provided a description of Defendant to the officers. Bajpai wanted to recover the bag because he believed it contained contraband "based on [his] training and experience and [Defendant's] action in stashing th[e] bag upon presence of police." A police report prepared by Bajpai states that his training and experience also led him to believe that Defendant was "attempting to distance himself from possible contraband present inside of the backpack." (*Id.*)

Bajpai and the two officers who were in the police car with him exited the vehicle. (*See* Gov't Ex. 3 (Bajpai's Body Camera Footage) at 00:12–00:15; Gov't Ex. 4 (Police Report).) Bajpai's police report states that he observed one of the officers "approach [Defendant] on the eastern sidewalk" as Bajpai "retrieved the mini backpack from where it was lying on the roadway." (Gov't Ex. 4 (Police Report).) Bajpai testified that he walked over to the back end of the Charger where he last observed Defendant to be in possession of the backpack. (*See* Gov't Ex. 3 (Bajpai's Body Camera Footage) at 00:15–00:22.) Bajpai estimated that upon exiting the vehicle he walked approximately ten feet from the rear of the police car to the rear of the Charger, whose red brake lights were on. (*See id.*) Bajpai "was able to see the backpack without bending down," but he had to bend down to "actually physically recover" the backpack.

Bajpai recovered the backpack from under the Charger, behind the back end of the rear wheel on the passenger side. (*See id.* at 00:20–00:27.) Given that the Charger was parked on the roadway, "the bag was also on the roadway." Bajpai indicated that he "had to reach underneath the car to recover said bag." (*See id.*) He did not have to

crawl under the car to obtain it. (*See id.*) He stated that he retrieved the backpack approximately thirty to forty seconds after Defendant put it down.

Two individuals who had been involved in the dice game were standing behind the Charger and were in close proximity to the bag when Bajpai recovered it. Bajpai agreed during his testimony that someone was standing right next to the bag when he reached down to get it. No one in the area claimed ownership of the bag, stopped Bajpai when he picked it up, or told Bajpai that the bag was theirs or not to touch it. (*See id.*)

When Bajpai grabbed the bag, he felt that it was "extremely heavily weighted and bottom heavy."[6] (*See* Gov't Ex. 4 (Police Report).) Based on his training and experience, those characteristics indicated to Bajpai that inside the bag was either an unknown heavy object or a firearm. (*See id.* ("Upon picking up the backpack, I observed it to be heavily weighted consistent with a firearm . . . .").)

---

[6] Bajpai testified that based on the size of the bag at issue, a "typical bag that's not containing a handgun or numerous rocks is maybe a pound or two. Usually they're used to contain documents like IDs, wallets, loose cash." The bag Bajpai picked up "felt like it was approximately maybe 10 pounds."

After Bajpai picked up the backpack, he saw that the other two officers "were in near proximity" to Defendant, who was wearing a black t-shirt with red and white lettering on it (instead of wearing no shirt, as was the case when he was first observed by Bajpai). (*See* Gov't Ex. 3 (Bajpai's Body Camera Footage) at 00:27–00:30; Gov't Ex. 4 (Police Report).) The three of them were approximately fifteen feet away from Bajpai, and they were on the eastern sidewalk. (*See* Gov't Ex. 3 (Bajpai's Body Camera Footage) at 00:27–00:30.) Bajpai instructed the officers to "detain [Defendant] for a sec[ond]" (*id.* at 00:29–00:33), which—according to Bajpai—meant that Defendant was not free to leave. The officers complied.

Bajpai placed the bag on the hood of a different uninvolved parked car that was on the east side of the street and facing north. (*See id.* at 00:32–00:34.) Bajpai indicated that Defendant was now less than ten feet away and that he was looking at Bajpai with the bag on the car or in Bajpai's direction. (*See id.*) Bajpai then opened the backpack. (*See id.* at 00:34–00:49.) Inside of the backpack's main compartment,[7] Bajpai

---

[7] Bajpai stated that the backpack had "a main compartment" and a smaller wallet-size compartment. (*See* Gov't Ex. 3 (Bajpai's Body Camera Footage) at 00:34–00:49.)

saw the base plate of an extended magazine attached to a silver handgun.[8] (*See id.* at 00:45–01:05; Gov't Ex. 4 (Police Report).) He instructed the officers to "put [Defendant] in cuffs" (Gov't Ex. 3 (Bajpai's Body Camera Footage) at 00:54–00:56), which Bajpai testified meant that Defendant was under arrest. Bajpai asked Defendant if he possessed a concealed pistol license, to which Defendant responded: "That's not mine." (*See id.* at 00:55–00:59.) Bajpai removed the firearm from the bag. (*See id.* at 01:00–01:07.) Defendant did not produce a concealed pistol license. Bajpai testified that it was later determined— after Defendant was arrested—that Defendant does not have a concealed pistol license.

## II.   **Legal Standard**

Under Federal Rule of Criminal Procedure 41(h), "[a] defendant may move to suppress evidence in the court where the trial will occur, as Rule 12 provides." Fed. R. Crim. P. 41(h). Federal Rule of Criminal Procedure 12(b)(3) instructs that "suppression of evidence" "must be

---

[8] During his search of the backpack, Bajpai also recovered (1) a wallet containing Defendant's identification card, (2) a small amount of marijuana, and (3) cash. (*See* Gov't Ex. 3 (Bajpai's Body Camera Footage) at 00:34–01:30; Gov't Ex. 4 (Police Report).) As Bajpai was searching the backpack, "everyone was watching [him] look through the bag."

raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3).

The proponent of a motion to suppress "bears the burden of establishing that the challenged search [or seizure] violated his Fourth Amendment rights." *United States v. Coleman*, 923 F.3d 450, 455 (6th Cir. 2019) (quoting *United States v. Witherspoon*, 467 F. App'x 486, 490 (6th Cir. 2012)), *cert. denied*, 140 S. Ct. 580 (2019). "In response to a motion to suppress, the Government has the burden of demonstrating, by a preponderance of the evidence, that the search or seizure was constitutionally valid." *United States v. Chambers*, Criminal Action No. 13-20254, 2014 WL 1365691, at *4 (E.D. Mich. Apr. 7, 2014) (citing *United States v. Bradley*, 163 F. App'x 353, 357 (6th Cir. 2005)), *aff'd*, 638 F. App'x 437 (6th Cir. 2015); *see United States v. Goins*, No. 20-20545, 2021 WL 2351092, at *1 (E.D. Mich. June 9, 2021) ("When faced with a motion to suppress based on the Fourth Amendment, the government must establish by a preponderance of the evidence that the police conduct did not amount to an unreasonable search and seizure." (quoting *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974))).

## III. Analysis

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *see Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 619 (1989) ("[T]he Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable." (internal citations omitted)). "[S]earches conducted outside the judicial process, without prior approval by [a] judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Taylor v. City of Saginaw*, 922 F.3d 328, 334 (6th Cir. 2019) (second alteration in original) (quoting *United States v. Hockenberry*, 730 F.3d 645, 658 (6th Cir. 2013)); *see Arizona v. Gant*, 556 U.S. 332, 338 (2009). "The government bears the burden of demonstrating an exception to the warrant requirement." *Taylor*, 922 F.3d at 334 (citing *United States v. Jeffers*, 342 U.S. 48, 51 (1951)); *see* 3A Charles Alan Wright et al., *Fed. Prac. & Proc. Crim.* § 689 (4th ed. 2025) ("When the defendant files a motion to suppress under Rule 41(h), the defendant has the initial burden of establishing that the search was

16

illegal if the police searched under a warrant. If the police searched without a warrant, the government carries the burden to bring the case within one of the exceptions to the warrant requirement." (footnote omitted)).

As noted, the government argues that the warrantless search of Defendant's backpack was proper because the backpack was abandoned. (*See* ECF No. 21, PageID.53–56.) "The warrantless search and seizure of abandoned property does not violate the Fourth Amendment." *United States v. Nelson*, 725 F.3d 615, 622 (6th Cir. 2013), *as clarified on denial of reh'g* (Jan. 16, 2014). "Whether property has been 'abandoned,' in this sense, does not depend on where legal title rests, or whether one asserting a Fourth Amendment right has a legally enforceable possessory interest in the property." *United States v. Oswald*, 783 F.2d 663, 666 (6th Cir. 1986); *see United States v. Tolbert*, 692 F.2d 1041, 1044 (6th Cir. 1982) ("It should be emphasized that the term 'abandonment,' as employed herein, does not refer to traditional concepts of property law."). "For Fourth Amendment purposes, the notion of 'abandonment' turns upon whether a person can claim a continuing, legitimate expectation of privacy in the item at issue."

*United States v. Robinson*, 390 F.3d 853, 873 (6th Cir. 2004) (citing *Tolbert*, 692 F.2d at 1044); *see United States v. Ocampo*, 402 F. App'x 90, 96 (6th Cir. 2010) ("[M]ere ownership of an item searched or seized does not establish a legitimate expectation of privacy; the Supreme Court has 'emphatically rejected the notion that "arcane" concepts of property law ought to control the ability to claim the protections of the Fourth Amendment.'" (quoting *Rawlings v. Kentucky*, 448 U.S. 98, 105 (1980); citing *Rakas v. Illinois*, 439 U.S. 128, 143 (1978))). "If property has been 'abandoned' in this sense, the Fourth Amendment is not violated through the search or seizure of this property." *Robinson*, 390 F.3d at 873–74 (citing *Tolbert*, 692 F.2d at 1044–45).

"A legitimate expectation of privacy exists when a person 'has exhibited an actual (subjective) expectation of privacy' and 'the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable.'" *Nelson*, 725 F.3d at 622 (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). "The Court assesses Defendant's subjective intent and whether an objective privacy expectation exists 'based on the totality of circumstances.'" *United States v. Vining*, 675 F. Supp. 3d 778, 792 (E.D. Mich. 2023) (quoting

*United States v. McClendon*, 86 F. App'x 92, 94 (6th Cir. 2004)), *appeal dismissed*, No. 23-1606, 2023 WL 9057497 (6th Cir. Aug. 14, 2023). "Whether a legitimate expectation of privacy exists in a particular place or item is a determination to be made on a case-by-case basis." *Ocampo*, 402 F. App'x at 95 (quoting *United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000)). "In making this determination," the Sixth Circuit

> consider[s] "the person's proprietary or possessory interest in the place to be searched or item to be seized[;]" "whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises."

*United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005) (second alteration in original) (quoting *King*, 227 F.3d at 744).

"Abandonment is primarily a question of intent, and intent m[a]y be inferred from words, acts, and other objective facts." *United States v. Dillard*, 78 F. App'x 505, 510 (6th Cir. 2003) (internal citation omitted). The Sixth Circuit has instructed that "whether abandonment has occurred is determined by the acts or omission of the property owner, as observed by a law enforcement officer." *United States v. Eden*, 190 F.

App'x 416, 425 (6th Cir. 2006) ("[W]e must focus on whether [the defendant's] outward manifestations demonstrated that she sought to preserve the suitcase as private, through the prism of a reasonable officer."). In addition, the Sixth Circuit has stated that "[u]ltimately, the government has the burden of establishing by a preponderance of the evidence that a 'defendant's voluntary words or conduct would lead a reasonable person in the searching officer's position to believe that the defendant relinquished [his] interests in the item searched or seized.'"[9] *Id.* at 423 (quoting *United States v. Basinski*, 226 F.3d 829, 836–37 (7th Cir. 2000)).

According to the Sixth Circuit,

[w]hen a person has disclaimed ownership of a discarded item or container, courts have repeatedly held that the person has no legitimate expectation of privacy in the item or container and has thus abandoned it. *United States v. Torres*, 949 F.2d 606 (2d Cir. 1991); *United States v. Frazier*, 936 F.2d 262 (6th Cir. 1991); *United States v. Knox*, 839 F.2d 285 (6th Cir. 1988); *United States v. Tolbert*, 692 F.2d 1041 (6th Cir. 1982). By contrast, defendants who assert an interest in the item are held not to have abandoned the item. *Smith v. Ohio*, 494 U.S. 541, 543–44, 110 S. Ct. 1288, 108 L.Ed.2d 464 (1990) ("[A] citizen who attempts to protect his

_____

[9] During the hearing, the government acknowledged that it has the burden to show by a preponderance of the evidence that Defendant, through his words or conduct, abandoned the backpack or disclaimed ownership of it.

private property from inspection, after throwing it on a car to respond to police officer's inquiry, clearly has not abandoned that property."); *United States v. Sanders*, 719 F.2d 882, 886 (6th Cir. 1983) (where defendant consistently refused to consent to search of the suitcase, she did not abandon it).

*Dillard*, 78 F. App'x at 510. Because Defendant "neither verbally disclaimed ownership of the [backpack prior to the search], nor . . . ma[d]e any attempt to protect it from search and seizure[,] [t]he question of abandonment, then, must be decided based on [Defendant's] actions and on the circumstances surrounding the alleged abandonment." *Id*.

Based on Defendant's conduct and the circumstances presented here, the Court finds that Defendant abandoned the backpack. Defendant's conduct and the surrounding circumstances do not reflect that Defendant exhibited an actual or subjective expectation of privacy in the backpack. Courts have determined that an individual does not demonstrate a subjective expectation of privacy in an item by throwing away the item "when the police come into view." *United States v. Rumph*, 145 F.3d 1334 (6th Cir. 1998) ("[O]ne does not manifest a subjective expectation of privacy in a plastic bag by throwing it away

when the police come into view."); *see Dillard*, 78 F. App'x at 512 (affirming the denial of the defendant's motion to suppress in a case in which the defendant "threw [a briefcase] on the ground when he realized the police were approaching" and the district court found that the defendant's "conduct did not exhibit an expectation of privacy in the briefcase"); *United States v. Morrow*, No. 16-CR-20854-MARTINEZ/GOODMAN, 2017 WL 457100, at *3, *6–7 (S.D. Fla. Jan. 20, 2017) (finding that the defendant abandoned a bag containing narcotics that he tossed "on top of a shelf above . . . coolers" in a store after making eye contact with a police officer "because he saw [the police officer] . . . approaching"), *report and recommendation adopted*, No. 16-20854-CR, 2017 WL 464381 (S.D. Fla. Feb. 1, 2017). "[W]hen a person discards an item as part of an attempt to resist arrest, courts have repeatedly found that the person abandoned the item." *Dillard*, 78 F. App'x at 511. "A[ ] line of relevant cases deals with defendants who, immediately prior to a police encounter, throw away items containing incriminating evidence." *Id.* at 512 (citing *United States v. Park*, 142 F.3d 437 (6th Cir. 1998)).

Here, there is evidence that Defendant discarded the backpack in reaction to the police approaching the area where he was standing. Bajpai testified that he saw Defendant "look[ ] quickly" in the direction of the semi-marked police car before he saw Defendant duck down behind the Charger. Bajpai indicated that the police car had DPD markings on the side, identifiable headlights, and a push bar. Bajpai also indicated that the car was in "pretty close proximity, so it would have been tough to not notice that that was a police car." Bajpai stated that "everyone knows what [the] police cars look like." Defendant did not challenge these portions of Bajpai's testimony during the hearing. Thus, Defendant did not exhibit a subjective expectation of privacy in the backpack when he set it down after looking in the direction of the police car and—based on Bajpai's testimony—presumably saw the police arrive to the area.

Moreover, that Defendant placed the backpack on a public street also favors a finding of abandonment. "One of the most crucial facts of an abandonment case is the location of the object in question." *Id.* at 510; *see Oswald*, 783 F.2d at 666–67 ("[P]rivacy expectations . . . will vary with the location of the property."); *Rios v. United States*, 364 U.S.

253, 262 n.6 (1960). In assessing the location of the object at issue in a different case, the Sixth Circuit noted the "open[ness]" of a public street. *Dillard*, 78 F. App'x at 510. The court contrasted dropping an item on a public street from dropping it "into the fenced-in curtilage of [a] family's home, an area enjoying full Fourth Amendment protection from search by the authorities." *Id.* The Sixth Circuit discussed the finding by a Florida court that an individual who discarded property on a public street "no longer had any reasonable expectation of privacy in the property which he discarded because he divested himself of all possession therein by dropping it in a place where the public had complete access." *Id.* (quoting *State v. Oliver*, 368 So.2d 1331, 1336 (Fla. Dist. Ct. App. 1979)).

In this case, Defendant discarded the backpack on a public street, where he had no expectation of privacy. Items left on a public street can be "damaged, lost, or stolen." *United States v. Tackett*, 486 F.3d 230, 233 (6th Cir. 2007). By leaving his backpack on a public street, Defendant had no right to exclude others from it. "[H]e physically relinquished control of the property." *United States v. Burston*, No. 1:12-CR-180-01-JOF/AJB, 2013 WL 787909, at *9 (N.D. Ga. Jan. 4, 2013), *report and*

*recommendation adopted*, No. 1:12-CR-0180-1-CAP, 2013 WL 787911 (N.D. Ga. Mar. 1, 2013). The location of Defendant's backpack on a public street is therefore consistent with abandonment; Defendant's actions and the surrounding circumstances do not show that he maintained a subjective expectation of privacy in his backpack based on where he placed it. *See United States v. LaBelle*, No. 07-CR-20608, 2008 WL 1931875, at *5 (E.D. Mich. May 2, 2008) (concluding that the defendant "abandoned his property on the side of a public highway where anyone may happen upon it" and that "[t]he location of Defendant's duffel bag suggests that he intended to discard it" (citing *Dillard*, 78 F. App'x at 510)), *aff'd*, 390 F. App'x 539 (6th Cir. 2010); *United States v. Burnett*, No. 24-1443, 2025 WL 40850, at *3 (7th Cir. Jan. 7, 2025) (determining that the defendant "abandoned any reasonable expectation of privacy" in "unsecured bags" he left "in a public area, exposing them to anyone who spotted them and was curious enough to open them"); *United States v. Stamper*, No. 1:07-cr-85, 2008 WL 62173, at *3 (E.D. Tenn. Jan. 3, 2008) ("[T]he defendant discarded his firearm on the ground next to a public sidewalk before he stopped to talk to Officer Crider. Consequentially, he abandoned any legitimate

expectation of privacy in the firearm before it was retrieved by Officer Crider, and Officer Crider's seizure of the firearm did not violate any of the defendant's rights under the Fourth Amendment."); *Burston*, 2013 WL 787909, at *9 ("Since the place [the defendant] tried to secret the bag was not a place to which he enjoyed a legitimate expectation of privacy, his action is not inconsistent with abandonment."); *cf. United States v. Tapia*, No. 1:19-cr-118, 2022 WL 1487041, at *8 (S.D. Ohio May 10, 2022) (agreeing with the defendant's argument that his "actions clearly demonstrate[ ] his intent to protect the red duffel bag," given that "the duffel bag was . . . placed in a location where it was well-concealed from public view, was within the curtilage of the property, and was located in an area that was not accessible to the general public" (first alteration in original)).

The Court recognizes that the backpack was not left out in the open on a public street; rather, Defendant placed it under the Dodge Charger and behind one of its back wheels. But Defendant did not have an expectation of privacy in that particular spot. Beyond the fact that the spot was on a public street, no evidence was presented about who owns the Dodge Charger or whether Defendant has any connection to it.

Bajpai testified that he did not know who owned it. In addition, when the bag was under the car, it was visible and accessible to the public. Bajpai testified that he was able to see the backpack without bending down. Bajpai had to reach under the Charger to recover the bag but did not have to crawl under the car to obtain it. Defendant thus did not have an expectation of privacy in the area beneath the Charger where the backpack was located. *See Burston*, 2013 WL 787909, at *9 (finding that the defendant did not "enjoy[ ] a legitimate expectation of privacy" in the corner of a warehouse where he attempted to hide the bag because "he left it in an area in which he had no legitimate access but which was generally accessible to other members of the public, i.e., the warehouse workers, who in fact delivered the bag to the police"); *cf. Tapia*, 2022 WL 1487041, at *11 (concluding that the defendant "attempted to exclude law enforcement's access to the duffel bag by keeping it in a location over which he had a reasonable expectation of privacy (*i.e.*, a private, concealed, and publicly inaccessible area outside the bedroom window of his home)"). Defendant's act of placing the backpack under the Charger does not establish that Defendant sought

to preserve the backpack as private.[10] *See Rumph*, 145 F.3d 1334 (finding that the retrieval by police officers of plastic bags containing drugs "was not unlawful," including the retrieval of a bag "placed . . . behind the left front tire of a parked car" in the defendant's driveway; the "plastic bags were located only a short distance from the public sidewalk and were plainly visible from the sidewalk"); *United States v. Morgan*, 936 F.2d 1561, 1570–71 (10th Cir. 1991) (finding abandonment in a case in which the defendant threw a bag "to the south side of the

---

[10] Bajpai testified that Defendant "stashed" the backpack. Bajpai stated that he used the word "stashed" in his testimony because he recovered the backpack from underneath the Dodge Charger—instead of from the spot where Defendant had been standing behind the Charger before he walked away. This testimony is insufficient to show that Defendant intended to keep the backpack private when considered together with Defendant's conduct and the surrounding circumstances, such as that Defendant discarded the backpack after looking in the direction of the police vehicle and that he left the backpack in a public place where it was visible and accessible from the street. *Cf. United States v. Pope*, 313 A.3d 565, 575 (D.C. 2024) (considering testimony that the defendant "stash[ed]" the bag to try to "hide" it as well as testimony that the defendant "took steps to secrete the backpack" in concluding that the defendant's "actions clearly evince his intention to maintain his expectation of privacy more patently than those in [other cases] because he hid his closed backpack in a storage area in a private home"). Moreover, despite Bajpai's use of the word "stash," there is no evidence regarding acts taken by Defendant to keep the bag well-hidden and protected. *Cf. United States v. Whiteside*, No. 3:22-cr-00040-FDW-DSC, 2022 WL 16707978, at *7 (W.D.N.C. Nov. 4, 2022) (finding that the defendant's actions showed that he "clearly sought to keep the contents of his backpack private, and his actual expectation that they remain private during his absence," because "before leaving his backpack, Defendant confirmed it was well-hidden and protected by his friends").

porch" of a residence in part because "the record indicates that the backyard of the . . . residence abutted an open field and wooded area," so "the bag would have been plainly visible to those passing by the yard via those open areas"); *United States v. Hooper*, 482 F. Supp. 3d 496, 510 (E.D. Va. 2020) ("When Defendant left his phone . . . on the table on someone else's platform in the public river, he ran the risk that strangers would come upon it. The fact that strangers could so readily access [the defendant's] phone gives rise to an inference of abandonment." (citing *United States v. Small*, 944 F.3d 490, 504 (4th Cir. 2019))), *aff'd*, No. 21-4220, 2022 WL 1184181 (4th Cir. Apr. 21, 2022); *cf. Tapia*, 2022 WL 1487041, at *9 ("[N]othing that is before the Court in the instant case undermines the notion that Defendant's placement of the duffel bag on a section of his home's roof, well-outside the lawful view and access of the public, was an effort 'to secrete the container in a place where he had an expectation of privacy.'" (quoting *Dillard*, 78 F. App'x at 511)).

Considering the facts discussed above—that Defendant set down the backpack on a public street when the police approached—the Court finds that Defendant "was not attempting to secrete the container in a

29

place where he had an expectation of privacy, but rather discarded the item in his attempt to avoid arrest." *Dillard*, 78 F. App'x at 511. Such a finding supports the conclusion that Defendant did not display a subjective expectation of privacy in the backpack and that the backpack was abandoned. *See Stamper*, 2008 WL 62173, at *3 ("[I]t has routinely been held that where a defendant discards an item in a public place to avoid arrest immediately before a police encounter, the defendant is said to have abandoned that property for purposes of determining whether he has a legitimate expectation of privacy in the item." (citing *California v. Hodari D.*, 499 U.S. 621, 629 (1991); *Dillard*, 78 F. App'x at 505)).

Another fact that favors a finding of abandonment is that Defendant did not give a clear signal asserting his privacy or conveying that he maintained a privacy interest in the backpack. There is no indication that Defendant told someone to watch the backpack for him before he stepped away from it. When Bajpai picked up the bag, no one claimed ownership of it, stopped Bajpai, or told Bajpai not to touch the bag. Two people were nearby when Bajpai recovered the bag—including at least one person who was standing next to it—but there is no

evidence that Defendant knew the individuals or that he had any connection to them (or any of the individuals on Manor Street). Defendant walked away from the bag and "did nothing . . . to suggest he still maintained an interest in it." *Morrow*, 2017 WL 457100, at \*6 (finding that the defendant "abandoned the bag" because he "did nothing . . . to suggest he still maintained an interest in it" (internal citation omitted)); *see Oswald*, 783 F.2d at 668 ("Had [the defendant] arranged to have his car secured against intrusion in his absence, or had he remained in the median or returned there to tell Officer Proaps to leave the metal suitcase alone, there would have been objective evidence that [the defendant] intended to retain his privacy interests in the suitcase."); *Tackett*, 486 F.3d at 233 (rejecting the defendant's argument that he "manifested his privacy interest in the bag" because "he never gave the police any clear signal asserting his privacy"); *Burnett*, 2025 WL 40850, at \*3 (rejecting the defendant's argument that he "did not relinquish his privacy interest in the bags because he remained nearby and attempted to conceal the bags near his truck," given that the argument "only highlights the fact that he did not keep the bags on his person, leave them in the truck, take them into his

apartment, or hand them to someone for safekeeping—recognized ways to protect privacy interests under the Fourth Amendment" (citing *Basinski*, 226 F.3d at 837)); *Morgan*, 936 F.2d at 1570–71 (holding that the defendant abandoned the bag, given that (1) "no attempt was made to protect the bag or its contents from inspection, nor did [the court] find any manifestations by [the defendant], verbal or otherwise, to indicate he retained a reasonable privacy interest in the bag," (2) the case was not one "where the item was left to the care or responsibility of another, or where there [wa]s a delayed indication of an intent to retain an expectation of privacy in the item," and (3) there was "no indication that [the defendant] requested the assistance of anyone to help recover or protect the bag" (internal citation omitted)); *Hooper*, 482 F. Supp. 3d at 510 (concluding that the defendant "relinquished his reasonable expectation of privacy in [his phone]" by "leaving his phone on a platform and walking away from it" because "[h]e did not attempt to shield the phone from other employees or the public on the river who might pass by it" and "no evidence exists that Defendant told [a person] who occupied the pier with him at the time[ ] to safeguard the phone until he returned"). This case is therefore distinguishable from cases in

which a court found that an individual maintained a subjective expectation of privacy in an item because the individual took various steps that displayed such a privacy expectation. *See United States v. Wilson*, 984 F. Supp. 2d 676, 682 (E.D. Ky. 2013) ("Defendant demonstrated more than just a desire to preserve these items. He did everything that he thought possible and practicable in his homeless state to preserve his privacy. Based on his efforts and his underlying intent, the Court finds that Defendant manifested a subjective expectation of privacy in the suitcase found in Evergreen Cemetery."); *United States v. Whiteside*, No. 3:22-cr-00040-FDW-DSC, 2022 WL 16707978, at *7 (W.D.N.C. Nov. 4, 2022) ("[B]efore leaving his backpack, Defendant confirmed it was well-hidden and protected by his friends. These actions show Defendant clearly sought to keep the contents of his backpack private, and his actual expectation that they remain private during his absence.").

During the hearing, Defendant argued that a Supreme Court case called *Smith v. Ohio*, 494 U.S. 541 (1990), supports his position that the backpack was not abandoned. *Smith* is a case in which the defendant

> dropped or discarded items in compliance with police instructions. In *Smith*, after the police identified themselves,

> the defendant tossed the bag he was carrying onto the hood of his car and turned to interact with the police, who had asked him to "come here a minute." 494 U.S. at 542. . . . [T]he defendant then attempted to protect his bag from a police search.

*Dillard*, 78 F. App'x at 511. The Supreme Court concluded that it

> ha[d] no reason to disturb [the Ohio Supreme Court's] conclusion [rejecting the argument that the bag was abandoned]. As the state court properly recognized, a citizen who attempts to protect his private property from inspection, after throwing it on a car to respond to a police officer's inquiry, clearly has not abandoned that property.

*Smith*, 494 U.S. at 543–44.

Defendant's argument is unpersuasive. *Smith* does not apply. *Smith* is factually different from this case because in this case, (1) Defendant did not throw his backpack on the hood of his car, (2) Defendant did not try to protect his backpack from inspection by Bajpai, (3) no police order was given to Defendant before he discarded the backpack, and (4) Defendant set down the backpack prior to interacting with the police. *See Morrow*, 2017 WL 457100, at *6–7 (finding that the defendant "abandoned the bag" and that *Smith* was "easily distinguishable" because "[u]nlike the defendant in *Smith*," the defendant in the case (1) "did not remain standing immediately next to

34

the property in question, where it would be easily retrievable," (2) "did not . . . throw the property nearby to respond to a police officer's inquiry," and (3) threw the bag because he saw the police officer approaching and "*before* he even had any type of encounter" with the officer (emphasis in original)).

In *United States v. Dillard*, the Sixth Circuit rejected the defendant's argument in which he relied on *Smith*. *See Dillard*, 78 F. App'x at 511. The Sixth Circuit stated that

> [t]here are obvious reasons for courts to give the benefit of the doubt to defendants who drop items while complying with police instruction. There would be a serious potential for abuse if police could compel an arrestee to "abandon" property on his person, which would then be fair game for a warrantless search. However, when a person discards an item as part of an attempt to resist arrest, courts have repeatedly found that the person abandoned the item.

*Id.* Here, Defendant was not complying with police instruction when he placed the backpack on the street. *Smith* is thus inapplicable.

In sum, Defendant's conduct and the surrounding circumstances do not establish that Defendant exhibited a subjective expectation of privacy in the backpack. Defendant discarded the backpack in response to the police coming into view. He placed the bag on a public street,

where it was visible and accessible to anyone in the area. He then walked away from the bag without conveying that he maintained a privacy interest in it. Moreover, "even if Defendant intended to later return and reclaim ownership of the bag, 'abandonment is not negated by 'the feeble hope of re-acquisition.'" *LaBelle*, 2008 WL 1931875, at *5 (quoting *Oswald*, 783 F.2d at 667); *Burnett*, 2025 WL 40850, at *3 ("[The defendant] may have intended to return to the bags later, but his subjective desire to later reclaim the bags is irrelevant to the abandonment analysis." (internal citation omitted)); *United States v. Arboleda*, 633 F.2d 985, 991 (2d Cir. 1980) ("Although [the defendant] may have intended to retrieve the package later, by placing it in an unprotected area he had abandoned it for Fourth Amendment purposes."); *United States v. Rivera*, No. 8:14-cr-61-T-36TGW, 2014 WL 6469432, at *4 (M.D. Fla. Nov. 17, 2014) ("Even if the Defendant hoped to recover the backpack later it would still be considered abandoned." (internal citations omitted)), *aff'd*, 646 F. App'x 803 (11th Cir. 2016); *Burston*, 2013 WL 787909, at *9 (rejecting the defendant's argument that he did not abandon the bag because "he was 'doubling back'" for it).

36

Defendant thus did not exhibit a subjective expectation of privacy in the backpack.

Even if Defendant had demonstrated a subjective expectation of privacy in the backpack, a legitimate expectation of privacy did not exist. The circumstances in this case do not support the conclusion that society would be prepared to find that Defendant's subjective expectation of privacy was reasonable. Defendant set down the backpack and walked away from it, leaving it on a public street. There—according to Bajpai—the backpack was visible to a person standing in the street and could be seen without bending down. The backpack was also accessible to the public; Bajpai reached under the car to recover the backpack and did not have to crawl under the car to obtain it. No evidence has been presented that Defendant had a connection to the Dodge Charger or to the people on Manor Street. In light of these facts, society would not recognize as reasonable Defendant's expectation of privacy in the backpack. *See Rumph*, 145 F.3d at 1334 ("Any expectation of privacy [the defendant] may have had in the items lying in his driveway and visible from the street was objectively unreasonable."); *Wilson*, 984 F. Supp. 2d at 683 (concluding

that "society would not recognize Defendant's expectation of privacy in the suitcase as reasonable" based on facts that include that "the suitcase was easily spotted and removed from its hiding place by" a woman "walking her dogs along one of her usual routes when she spotted the suitcase resting under a tree about ten feet into the woods"); *United States v. Kyle*, 268 A.3d 1256, 1259–61 (D.C. 2022) (holding that the defendant "clearly lacked an objectively reasonable expectation of privacy in the backpack" that he threw "into another person's backyard" where "there was no evidence that [the defendant] had any connection to the homeowner"); *cf. Whiteside*, 2022 WL 16707978, at *7 (concluding that the defendant's "expectation of privacy in his backpack and the contents within [wa]s objectively reasonable" because (1) the defendant "went into the restaurant after confirming his bag was sufficiently concealed," (2) the defendant "did not leave his bag alone in a public parking lot; he left it where his friends were still gathered," and (3) "[r]ather than abandoning his backpack out in the open, Defendant took active steps to ensure it would remain hidden" and "made multiple attempts to shield the bag from passersby and the public to keep it hidden until he returned").

Based on the totality of the circumstances, the Court finds that the backpack was abandoned. Defendant did not have a legitimate expectation of privacy in the backpack. He did not exhibit an actual or subjective expectation of privacy in the backpack. *See Nelson*, 725 F.3d at 622. Even if he did, society is not prepared to recognize that subjective expectation of privacy as reasonable. *See id.* Accordingly, the warrantless search of the backpack did not violate the Fourth Amendment. Defendant's motion to suppress is therefore denied.

## IV.   Conclusion

For the reasons set forth above, Defendant's motion to suppress evidence (ECF No. 19) is DENIED.

IT IS SO ORDERED.

Dated: June 16, 2025             s/Judith E. Levy
     Ann Arbor, Michigan       JUDITH E. LEVY
                                       United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 16, 2025.

                          s/William Barkholz
                          WILLIAM BARKHOLZ
                          Case Manager